**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CERTAIN UNDERWRITERS AT | : | |
| LLOYD'S OF LONDON, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:20-CV-01099 (JCH) |
| | : | |
| v. | : | |
| | : | |
| BREWER FERRY POINT MARINA, INC. | : | MAY 20, 2022 |
| ET AL., | : | |
| Defendants. | : | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 44)**

**I.    INTRODUCTION**

Plaintiff Certain Underwriters at Lloyd's of London ("Certain Underwriters"), as subrogee of Stephen Rak, brought this one count Complaint on August 3, 2020, alleging that defendants Brewer Ferry Point Marina, Inc. ("Brewer"), SHM Ferry Point, LLC ("SHM"), and Safe Harbor Marinas, LLC ("Safe Harbors") were negligent in failing to inspect and reinstall the drainplug in Rak's vessel prior to launch, thereby allowing it to fill with water and damage certain equipment.  See generally Compl.

Defendants SHM and Safe Harbors have moved for summary judgment.  See Defs.' Mot. for Summ. J. (Doc. No. 44); Mem. of Law in Supp. of the SHM Defs.' Mot. for Summ J. ("Defs.' Mem.") (Doc. No. 44-1); Defs.' Reply Mem. in Further Supp. of Mot. for Summ. J. ("Defs.' Reply").  Certain Underwriters opposes this Motion.  See Pl.'s Mem. of Law in Opp'n to SHM Ferry Point, LLC's Mot. for Summ. J. ("Pl.'s Mem.") (Doc. No. 47).

For the reasons discussed below, the court grants the Motion for Summary Judgment as to defendant SHM.  The claim against Safe Harbor is dismissed, and the claim against Brewer is terminated as moot.

1

II.   **FACTS**[1]

Many of the facts in this case are not in dispute. During the relevant period, Stephen Rak owned a 2016 50-foot Outerlimits SL 50 powerboat (the "Rak vessel"). Defs.' R. 56(a)1 Stmt at ¶ 2; Pl.'s R. 56(a)2 Stmt at ¶ 2.  In October 2017, defendant SHM sent all prospective patrons for the upcoming year a packet in the mail containing, inter alia, a summer slip contract for 2018.  Defs.' R. 56(a)1 Stmt at ¶ 6; Pl.'s R. 56(a)2 Stmt at ¶ 6.  The prospective patrons that received the packet included Stephen Rak's father, John Rak.  Defs.' R. 56(a)1 Stmt at ¶¶ 3, 6; Pl.'s R. 56(a)2 Stmt at ¶¶ 3, 6.  John Rak read and signed that contract, along with the General Marina Rules and Conditions, so that the Rak vessel could be stored at SHM's marina that summer.  Defs.' R. 56(a)1 Stmt at ¶¶ 7, 9, 13; Pl.'s R. 56(a)2 Stmt at ¶¶ 7, 9, 13.  John Rak had done the same in previous years, and in the summer of 2018, again paid SHM pursuant to that contract so that his son Stephen could store the Rak vessel at its marina.  Defs.' R. 56(a)1 Stmt at ¶¶ 10-11; Pl.'s R. 56(a)2 Stmt at ¶¶ 10-11.  All interactions regarding the contract and payment were between John Rak and SHM, and Stephen Rak never told SHM that he was the owner of the Rak vessel, not his father.  Defs.' R. 56(a)1 Stmt at ¶¶ 17, 21; Pl.'s R. 56(a)2 Stmt at ¶¶ 17, 21.

The contract John Rak entered into with SHM contains two documents.  The first is the "Summer Contract Terms and Conditions", which the elder Rak signed on October 5, 2017.  See 2018 Summer Slip Contract, Pl.'s Ex. 1 (Doc. No. 47-2).  That document provides certain contractual terms, and also explicitly incorporates the

---

[1] The court draws primarily for the parties' Local Rule 56(a) statements and supporting exhibits in summarizing the material facts, construing those facts in the light most favorable to Certain Underwriters.

General Marina Rules and Conditions into the agreement.  Id.; see also Defs.' Ex. A, Ex. C to Aff. of Matthew Marshall (Docs. No. 44-5, 44-7) (providing the rules and conditions themselves and then the page with John Rak's signature).  For the purposes of this Motion, SHM highlights two provisions in its contract: the waiver of subrogation clause and the release of liability clause.  The first reads:

> **WAIVER OF SUBROGATION**: Marina and Owner hereby mutually waive any and all rights of recovery against one another based upon the negligence of either party or their agents or employees for real or personal property loss or damage occurring to the Slip, the Vessel, or to the Matina or any personal property located on the Marina or in the Slip from perils which are paid or reimbursed by an insurer of Marina or Owner under any fire, extended coverage or other property insurance policy maintained by Owner or Marina (or which would have been paid had the insurance required to be maintained hereunder been in full force and effect).  Each party shall cause its insurance carrier to endorse all applicable policies waiving the carrier's rights of recovery under subrogation or otherwise against the other party.  This section shall survive the termination or expiration of this Agreement.

Defs.' Ex. A to Aff. of Matthew Marshall.  The second provides:

> **RELEASE**: Owner agrees that Marina, its lessor, and its designated property management company, and their respective partners, members, affiliates, and subsidiaries, and all of their respective officers, trustees, directors, shareholders, employees, servants, partners, representatives, insurers and agents (collectively, "Marina Indemnitees") shall not be liable to Owner or to any party claiming by, through or under Owner for (and Owner hereby releases Marina Indemnitees from any claim or responsibility for) any injury (including death) to persons or damage to or destruction, loss, or loss of use, or theft of any property of Owner or of Owner's officers, directors, employees, agents, representatives, Owners, Invitees, customers, assignees, subtenants, or contractors, or contractors [sic] (collectively, "Boat Owner Parties") located in or about the Marina or of any injury (including death) of any Boat Owner Parties caused by casualty, theft, fire, third parties or any other matter or cause, **EVEN IF SUCH LIABILITIES ARE CAUSED SOLELY OR IN PART BY THE NEGLIGENCE OF ANY MARINA INDEMNITEE, BUT NOT TO THE EXTENT SUCH LIABILITIES ARE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR ANY SUCH MARINA INDEMNITEE**.  Owner acknowledges that Marina will not carry insurance on, and shall not be responsible for damage to, any property of a Boat Owner Party.  This section shall survive the termination or expiration of this Agreement.

3

Id.

On August 3, 2018, the Rak vessel was stored at SHM's marina in Old Saybrook, Connecticut. Defs.' R. 56(a)1 Stmt at ¶ 4; Pl.'s R. 56(a)2 Stmt at ¶ 4. That day, the Rak's took the vessel out across Long Island Sound to Montauk, New York, for lunch. Defs.' R. 56(a)1 Stmt at ¶ 30; Pl.'s R. 56(a)2 Stmt at ¶ 30. In preparation for their trip, SHM took the Rak vessel out of the indoor storage area using a travel lift and launched it into the water. Aff. of Matthew Marshall at ¶ 17. Matthew Marshall, who was the General Manager of SHM at the time, also averred that "it [was] the custom and practice of SHM to inspect the engine compartment for water" after it was launched.[2] Id.

Once the vessel was launched, Marshall received a phone call from the SHM employee who had conducted the launch, and he then "towed the Rak [v]essel to the transient dock where the Raks would meet it when they arrived." Id. While towing the vessel, he "did not notice any water being discharged from [it] by the bilge pumps." Id. According to Marshall, after he secured the Rak vessel to the transient dock, he checked the engine compartment for water but did not find any. Id. at ¶ 18. The vessel

----

[2] Plaintiff objects to the admission of certain statements in Marshall's Affidavit, arguing that in several instances Marshall "did not witness [the event] personally, or confirm with an SHM employee that [the event] actually [happened]. He relies only on the SHM policy that requires that [a] task . . . be performed." Pl.'s R. 56(a)2 Stmt at ¶ 23; see also id. at ¶ 24. While Certain Underwriters is correct that the conclusions Marshall draws from the organization's customs and practices are inadmissible – i.e., that just because it was the practice of SHM to inspect the engine compartment for water, SHM did indeed inspect the Rak vessel that day – evidence of "an organization's routine practice may be admitted to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice." Fed. R. Evid. 406. Thus, evidence of SHM's customs and practices is admissible, though it would be for the jury to determine the probative value of such evidence. See, e.g., Crawford v. Tribeca Lending Corp., 815 F.3d 121, 125 (evidence of a practice regarding a repeated specific situation is admissible under Rule 406).

Because the court must construe all evidence in the light most favorable to Certain Underwriters at this stage, it notes the policies and procedures Marshall highlights in his Affidavit but does not infer that they were followed as to the Rak vessel on August 3 simply because those policies were in place. See Aff. of Matthew Marshall at ¶¶ 17, 20.

then remained at the dock for approximately 2-3 hours before departure.[3]  Id.  After the

Raks arrived, an employee of Offshore Northeast, LLC ("Offshore") gave the Raks "a

jump start because the batteries were dead."  Dep. of John Rak at 36.  The employee

was on board for about 15 minutes, according to John Rak, and he just "put the cables

on the boat and jump start[ed] it and left."  Id.

When the Raks departed the Old Saybrook marina, they first stopped at a gas

dock to take on fuel.  Defs.' R. 56(a)1 Stmt at ¶ 27; Pl.'s R. 56(a)2 Stmt at ¶ 27.  They

then proceeded to cross the Long Island Sound and docked in Montauk, New York.

Defs.' R. 56(a)1 Stmt at ¶ 28; Pl.'s R. 56(a)2 Stmt at ¶ 28.  When they secured the

vessel at the marina in Montauk, there was no noticeable water in the vessel and the

bilge pumps were not operating.  Defs.' R. 56(a)1 Stmt at ¶ 30; Pl.'s R. 56(a)2 Stmt at ¶

30.  Approximately half an hour later, however, while they were eating lunch somebody

approached the Raks to inform them their boat was sinking.  Dep. of John Rak at 23,

25.  After rushing to the dock, Stephen Rak jumped into the water and checked for the

drain plug.  Id. at 26.  He found that it was missing, but was able to stick a rag in the

hole to stop the flow of water into the vessel.  Id.  Eventually, with the help of a

bystander at the marina, they were able to find a new drain plug, install it, and clear the

water from the vessel.  Id.  They then washed the vessel down, got it started, and tried

to limit the damage.  Id. at 27.  Once the boat was seaworthy again, they traveled back

to Connecticut.  Id. at 27-28.  Certain Underwriters, who insured the Rak vessel at the

---

[3] Certain Underwriters disputes this, arguing that Marshall's testimony "is contradicted by John
Rak, who testified that his family and friends were at the Old Saybrook marina for only 'half and hour.'"
See Pl.'s Mem. at 19 (quoting Dep. of John Rak at 35).  However, these statements are not inconsistent
with one another.  John Rak testified only as to how long his family was at the marina before going out on
the vessel.  He did not testify to how long the boat had been in the water before they arrived.

time through a policy taken out by Stephen Rak, alleges that the damages to the vessel

totaled approximately $130,000, and that it has paid that amount in full to Stephen Rak.

See Compl. at ¶ 33.

## III.   PROCEDURAL HISTORY

Plaintiff Certain Underwriters filed its one count Complaint on August 3, 2020.

The action was originally brought against three named defendants, Brewer Ferry Point

Marina, Inc. ("Brewer"), SHM Ferry Point, LLC ("SHM"), and Safe Harbor Marinas, LLC

("Safe Harbors").  However, the Complaint alleged its single negligence count against

Brewer "and/or its successor-in-interest."  Compl. at ¶ 31.  It also alleged "it[s] belie[f]

that . . . Safe Harbor and/or SHM[ ] is a successor-in-interest to [Brewer]."  Id. at ¶ 10.

Although all three defendants were served, see Doc. No. 8, only SHM and Safe Harbor

subsequently appeared.  See Notice of Appearance (Doc. No. 9).

Following discovery, both SHM and Safe Harbor jointly filed the instant Motion for

Summary Judgment.  In their Local Rule 56(a) statements, however, they represented

that "SHM Ferry Point, LLC is the correct party to [this case] since this entity succeeded

to the rights of Brewer Ferry Point Marina, Inc. Safe Harbor Marinas, LLC is wrongly

named as a defendant in this case."  Aff. of Matthew Marshall at ¶ 4.  As such, the

parties appeared to agree that "[d]efendant SHM . . . is the proper party to this action."

Defs.' R. 56(a)1 Stmt at ¶ 1; Pl.'s R. 56(a)2 Stmt at ¶ 1.  However, because Certain

Underwriters had never amended its Complaint and both Brewer and Safe Harbor

remained named defendants, the court ordered plaintiff to show cause "as to why it

should not dismiss the case as to defendant Safe Harbor on th[e] ground" that it was

"improperly named as a party to this action."  See Order Regarding Defendants' Motion

for Summary Judgment at 2 (Doc. No. 49).  It also ordered plaintiff to show cause "as to

why the claim against Brewer should not be terminated as moot, given defendants'

representation that SHM is its successor-in-interest." Id.

On May 12, 2022, Certain Underwriters responded to the court's order to show

cause, agreeing that the claim against Safe Harbor could be dismissed and the claim

against Brewer could be terminated as moot. See Pl.'s Notice and Stipulation Re

Parties to this Action (Doc. No. 50). Accordingly, the court does so, and henceforth in

this Ruling refers to SHM as the sole remaining defendant.

Separately, on September 14, 2020, defendant SHM impleaded Offshore

pursuant to Federal Rule of Civil Procedure 14(c). See generally Third-Party Compl.

(Doc. No. 14). In its Third-Party Complaint, SHM alleged that, "[b]efore and during the

incident alleged in [Certain Underwriters'] Complaint, Offshore . . . was performing

work/repairs onboard the subject vessel." Third-Party Compl. at ¶ 8. Therefore, SHM

alleged, "[i]f Plaintiff sustained any losses . . . said losses were caused by or contributed

to by the negligence or breach of contract on the party of Third-Party Defendant,

Offshore." Id. at ¶ 7. Offshore answered the Third-Party Complaint a month later, and

asserted two counterclaims against SHM. See Answer and Counter-Claims (Doc. No.

17).

## IV.    STANDARD OF REVIEW

A Motion for Summary Judgment will be granted if the record shows "no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing

the absence of a genuine dispute of material fact. Celotex Corp. v. Cartrett, 477 U.S.

317, 323 (1986). The non-moving party may defeat the motion by producing sufficient

specific facts to establish that there is a genuine issue of material fact for trial.

7

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).  A genuine issue of material fact exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor.  <u>See, e.g.</u>, <u>Biondo v. Kaledia Health</u>, 935 F.3d 68, 73 (2d Cir. 2019) (citing Anderson, 477 U.S. at 248)).

In addition, Certain Underwriters' claim invokes this court's admiralty jurisdiction.  In an admiralty action, "absent a relevant statute, the general maritime law, as developed by the judiciary, applies."  <u>East River S.S. Corp. v. Transamerica Delaval, Inc.</u>, 476 U.S. 858, 864 (1986).  "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules."  <u>Id.</u> at 864-65.  For a negligence claim "governed by admiralty law . . . [t]he common law rules of negligence [generally] apply."  <u>Smith v. Mitlof</u>, 198 F. Supp. 2d 492, 501 (S.D.N.Y. 2002).

## V.   ANALYSIS

SMH moves for summary judgment on two grounds.  First, they argue that the release and waiver of subrogation clauses in the contract each govern the storage of the Rak vessel and preclude the lawsuit.  <u>See</u> Def.'s Mem. at 8-14.  Second, they argue that, even if the court were to find that those two contractual provisions to not bar recovery, plaintiff has failed to introduce into the record any "evidence that SHM removed or failed to reinstall the [v]essel's drain plug or failed to inspect the Rak [v]essel before launching it."  <u>Id.</u> at 2; <u>see also</u> <u>id.</u> at 14-16.  Because there is "no evidence of [SHM's] negligent acts or omissions [that] exists", this argument goes, "summary judgment is warranted."  <u>Id.</u> at 2.

Certain Underwriters responds to the Motion with four arguments.  The first is frivolous.  They assert that the motion is untimely because "it was filed two months after

the deadline set by the court."  See Pl.'s Mem. at 1; see also id. at 9-10.[4]  More substantively, they also argue: (1) that any reliance on the summer slip contract is misplaced, since its terms bind only John Rak and thus do not preclude Certain Underwriters from pursuing a subrogation claim on behalf of Stephen Rak, see id. at 10-12; (2) that even if the contract applies, "the ambiguities in [it] are so numerous that the validity of the entire [c]ontract . . . must be questioned", see id. at 13, see also id. at 13-18, and (3) that questions of material fact exist as to SHM's negligence that preclude summary judgment.  Id. at 18-21.

The court addresses each of the parties' arguments in turn.

A.    Timeliness of the Motion for Summary Judgment

Certain Underwriters first argues that defendants' Motion for Summary Judgment is not timely.  Id. at 9-10.  It mistakenly believes that the deadline for dispositive motions was November 30, 2021, and therefore that defendants' January 27, 2022 submission was almost two months late.  Plaintiff is incorrect.

The court issued the initial scheduling order in this case on November 19, 2020. See Scheduling Order Regarding Case Management Plan (Doc. No. 25).  That order set the discovery deadline as August 1, 2021, and the deadline for dispositive motions as August 30, 2021.  Id. at 1-2.  After the parties jointly moved for an extension of time on May 12, 2021, the court granted the Motion and reset the discovery and dispositive motion deadlines to November 1, 2021 and November 30, 2021, respectively.  See Mot. for Extension of Time (Doc. No. 32); Am. Scheduling Order (Doc. No. 34).  Following a

---

[4] As discussed below, this argument is based entirely on a misreading of the scheduling order in this case. See infra at Section V.A.

settlement conference before Judge Richardson, the parties again moved for an extension of time.  See Joint Mot. to Extend Expert Disclosure Deadlines (Doc. No. 42). More specifically, they sought a further "sixty (60) day extension of the expert disclosure deadlines" based on their belief that the "limited discovery w[ould] assist them in narrowing the issues and [could] result in a successful settlement."  Id. at 1.

The court granted that Motion in part later that month.  In a Minute Entry, it ordered, inter alia, that all "experts will be deposed on or before January 1, 2022.  See Minute Entry (Doc. No. 43).  To be sure, the parties did not explicitly request – and the court did not explicitly grant – an extension of the dispositive motion deadline.  Perhaps, for the sake of clarity, the court should have issued a second amended scheduling order doing just that.

Still, Certain Underwriters' argument that the court's Order extended the expert discovery deadline until January 1, 2022, but maintained the dispositive motion deadline as November 30, 2021 is disingenuous.  First, having a deadline to move for summary judgment a month prior to the close of discovery is simply illogical.  Second, if plaintiff's understanding of the scheduling order was correct, then, in the absence of a motion for summary judgment, the parties would have been required to submit a Joint Trial Memorandum no later than November 30.  Am. Scheduling Order at 2.  If plaintiff's counsel had this understanding of the scheduling order and was acting in good faith, it raises questions as to why it does not appear he reached out to defense counsel to prepare and submit such a Memorandum by the deadline.  Third, Federal Rule of Civil Procedure 56(a)(b) provides that, "[u]nless . . . the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all

discovery."  Fed. R. Civ. P. 56(b).  In this court's opinion, granting a joint motion by the parties to extend discovery deadlines but neglecting to issue a second amended scheduling order expressly extending the Joint Trial Memorandum and dispositive motion deadlines does not constitute the court "order[ing] otherwise."

For all these reasons, the court holds that defendants' Motion for Summary Judgment was timely filed.

      B.    <u>Application of the Summer Slip Contract to the Rak Vessel</u>

Certain Underwriters next argues that the summer slip contract is inapplicable in this case because that contract was between John Rak and SHM, and thus cannot cover the storage of the Rak vessel that was owned by Stephen Rak.  Pl.'s Mem. at 10-12.  As a corollary of this argument, it asserts that Stephen Rak "never entered into any contract or agreement with SHM."  <u>Id.</u> at 12.  This argument is unavailing for several reasons.

First, Certain Underwriters pled the exact opposite in its Complaint.  <u>See</u> Compl. at ¶ 10 ("[i]t [is] believed that . . . [Stephen] Rak entered into a storage contract" with SHM).  "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding."  <u>Rojas v. Roman Catholic Diocese of Rochester</u>, 660 F.3d 98, 106 (2d Cir. 2011) (internal quotations and citations omitted).  Second, if the court were to accept Certain Underwriters' argument that there was no contract between Stephen Rak and SHM, it would seemingly undermine the basis for this entire lawsuit.  Certain Underwriters is the subrogee of Stephen Rak.  In its Complaint, it alleged that, pursuant to the storage contract between Stephen Rak and SHM, SHM "owed Mr. Rak a duty to maintain the [v]essel and her appurtenances in a seaworthy condition and to exercise reasonable case in the management and

11

maintenance of the same."  Compl. at ¶ 31; <u>see also</u> Pl.'s Mem. at 7 (clarifying that its

claim is for "<u>negligence</u> against SHM based on its breach of duty to perform valet

services for Stephen Rak") (emphasis in original).  Although its sole count is for

negligence and not breach of contract, absent any contractual duty flowing from SHM to

Stephen Rak, it is not clear where the duty of care for the vessel would arise from.  Nor

has Certain Underwriters pointed to any evidence in the record (or put forth any

argument) that there is any other source for the duty other than the summer slip

contract.

       The court need not definitively resolve these issues, however, because it

concludes that Stephen Rak was an intended third-party beneficiary – in particular a

donee beneficiary – of the contract between John Rak and SHM.[5]  Restatement

(Second) of Contracts § 302(1)(b) provides that, "[u]nless otherwise agreed between

promisor and promisee, a beneficiary of a promise is an intended beneficiary if

recognition of a right to performance in the beneficiary is appropriate to effectuate the

intention of the parties and . . . the circumstances indicate that the promisee intends to

give the beneficiary the benefit of the promised performance."  Restatement (Second) of

Contracts § 302(1)(b) (1981).  Comment c to section 302 goes on to provide that:

> Where the promised performance is not paid for by the recipient, discharges
> no right that he has against anyone, and is apparently designed to benefit

---

[5] "Federal courts apply [the] ordinary principles of maritime contract law to disputes involving maritime contracts."  <u>Nippon Yusen Kaisha v. FIL Lines USA Inc.</u>, 977 F. Supp. 2d 343, 349 (S.D.N.Y. 2013) (internal quotations and citations omitted).  Because "common law third-party beneficiary principles are generally applicable" in the maritime context, the court relies on the Restatement here.  <u>Laurel Shipping LLC v. Ridgebury Kilo LLC</u>, --- F. Supp. 3d ----, No. 20-CV-7246, 2021 WL 4253429, at *4 (S.D.N.Y. Sept. 17, 2021); <u>see also</u> <u>In re M/V Rickmers Genoa Litigation</u>, 622 F. Supp. 2d 56, 72 (S.D.N.Y. 2009) (applying "common law third-party beneficiary principles" to the interpretation of a bill of lading and looking the Restatement (Second) of Contracts to do so).  Indeed, the Second Circuit has observed that "[t]here are few clean lines between maritime and non-maritime contracts."  <u>Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York</u>, 822 F.3d 620, 632 (2d Cir. 2016) (internal quotations and citations omitted).

> him, the promise is often referred to as a "gift promise."  The beneficiary of
> such a promise is often referred to as a "donee beneficiary"; he is an
> intended beneficiary under Subsection (1)(b).  The contract need not
> provide that performance is to be rendered directly to the beneficiary: a gift
> may be made to the beneficiary, for example, by payment of his debt.  Nor
> is any contact or communication with the beneficiary essential.

Id. at § 302 cmt. C (1981).[6]

Here, Stephen Rak was plainly a donee beneficiary to the contract between SHM

and John Rak.  The parties agree that "John Rak paid SHM" pursuant to the summer

slip contract – both in 2018 and in years past – for the explicit purpose of allowing "his

son Stephen [to] store vessels there."  Defs.' R. 56(a)1 Stmt at ¶¶ 10-11; Pl.'s R. 56(a)2

Stmt at ¶¶ 10-11.  In 2018, there was no other vessel owned by John Rak or the Rak

family to which the contract could apply.  Moreover, the conduct of the parties clearly

demonstrates their intent for the summer slip contract to govern the storage of the Rak

vessel during the summer of 2018.  After signing the contract to allow Stephen to store

his vessel there, both SHM (by providing services) and John Rak (by paying) performed

under the contract, while Stephen accepted its benefits.  Thus, under § 302(1)(b), the

"recognition of a right to performance" by SHM to Stephen Rak "is appropriate to

effectuate the intention of the parties."  Restatement (Second) of Contracts § 302(1)(b)

(1981).  Given John Rak's testimony that he was signing the contract so that his son's

vessel could be stored, the "circumstances [also] indicate that [John Rak] intend[ed] to

give the beneficiary", Stephen Rak, "the benefit of [SHM's] promised performance."  Id.

In addition, since comment c makes clear that "[t]he contract need not provide that

---

[6] In addition, section 304 stipulates that "[a] promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty." Restatement (Second) of Contracts § 304.

performance is to be rendered directly to [Stephen Rak]", nor is "any contact or communication with the beneficiary essential" in the context of a gift promise, the fact that SHM had no knowledge that the Rak vessel belonged to Stephen rather than John Rak is of no import.

Thus, because Stephen Rak was a donee beneficiary of the contract signed by his father, the court concludes that the summer slip contract applies to the storage of his vessel.

C.     Ambiguities in the Contract

Next, Certain Underwriters argues that the summer slip contract is so ambiguous that its entire validity must be questioned.  Pl.'s Mem. at 13-18.  In particular, it argues that the contract's failure to identify "(1) the [v]essel [o]wner, (2) any vessel that is subject to the [c]ontract, or (3) the scope of the services . . . offered by SHM" means that the document lacks the "essential terms required to form a contract" and thus (presumably) should be void.  Id. at 13.  The court disagrees.

As a general matter, "when parties fail to agree to essential contract terms, the agreement does not come into existence – it is void and wholly unenforceable."  Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co., 263 F.3d 26, 31 (2d Cir. 2001); see also Baker v. Robert I. Lappin Charitable Foundation, 415 F. Supp. 2d 473, 483 (S.D.N.Y. 2006) ("[i]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract") (internal quotations and citations omitted).  However, "[t]here is no legal doctrine that requires a court to restrict its examination to the 'four corners' of a contract", as Certain Underwrites asks the court to do here.  Shann v. Dunk, 84 F.3d 73, 79 (2d Cir. 1996).  Indeed, in "determining [the] enforceability of [a] contract, court[s] may look outside [the] 'four-corners' to consider factors such as

14

circumstances surrounding its formation", including "the purpose for which the contract was made, the circumstances under which it was made, and the relation of the parties." Id. (internal quotations and citations omitted).  "Where essential terms are missing, a court may not rewrite a contract for the parties to impose obligations not bargained for, but the court must consider whether the missing terms can be supplied in a reasonable fashion consistent with the intent of the parties."  Baker, 415 F. Supp. 2d at 484.  In general, courts prefer this approach when possible, as they are "'loath to refuse enforcement of agreements on indefiniteness grounds'", and will only do so "'if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain.'"  Id. at 483-84 (quoting Best Brands Beverage v. Falstaff Brewing Corp., 842 F.2d 578, 588 (2d Cir. 1987)).

Here, there is no question that, even if the actual written portions of the agreement signed by John Rak did not include some terms, the essential terms of the contract between he and SHM that Certain Underwriters challenges were entirely clear. As an initial matter, the parties had a course of dealing whereby John Rak would pay SHM each summer for the storage of a vessel owned by someone in his family.  Aff. of Matthew Marshall at ¶ 8.  As part of their agreement, both sides understood that, when Rak "call[ed] the marina [to] tell them when [he] wanted to use [the vessel], they would put it in the water; and then when [he] was done, they would take it out."  Dep. of John Rak at 20; see also Aff. of Matthew Marshall at ¶ 17; Defs.' R. 56(a)1 Stmt at ¶ 8; Pl.'s

R. 56(a)2 Stmt at ¶ 8 (referring to this as "Inside Valet Services" or "IVS").[7]  Course of dealing may become part of an agreement when "there is an indication of the common knowledge and understanding of the parties."  Auscape Intern. v. Nat'l Geographic Soc., 282 F. App'x 890, 891 (2d Cir. 2008) (internal quotations and citations omitted).  What is more, when he signed the contract, John Rak handwrote "IVS" on the line entitled "The Rate for the Slip #."  See 2018 Summer Slip Contract, Pl.'s Ex. 1 (Doc. No. 47-2).  Thus, from the common understanding and course of dealing between the two parties, it is plain that they intended for IVS services to be included in their agreement.

Certain Underwriters' argument that the contract did not specify Stephen Rak as the owner of the Rak vessel – or the Rak vessel itself as the vessel to be stored – falls short for similar reasons.  "The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."  Restatement (Second) of Contracts § 202 cmt. G.  "Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with . . . any relevant course of performance [and] course of dealing."  Id. at § 202(5).  Here, there is a history of John Rak paying SHM "so that his son Stephen could store vessels there in years past."  Defs.' R. 56(a)1 Stmt at ¶ 11; Pl.'s R. 56(a)2 Stmt at ¶ 11.  In 2018, the parties agree that the reason John Rak signed the summer slip contract was again "so that his son Stephen could store the Rak [v]essel" at the SHM marina.  Defs.'

---

[7] SHM, for its part, argues that IVS was not a part of the contract.  See Def.'s Reply at 5-6 (arguing that there is no admissible evidence in the record that IVS was included in the agreement). Certain Underwriters' position is less clear and at times confusing.  In its Rule 56 Statement, it says that IVS was part of the contract between SHM and John Rak.  Pl.'s R. 56(a)2 Stmt at ¶ 14.  Yet in its Memorandum, Certain Underwriters then contends that the failure to delineate "the scope of the services ('IVS')" in the written summer slip contract meant that an "essential term[ ] required to form a contract" was missing.  Pl.'s Mem. at 13.  Regardless, the court holds here that provision of IVS was part of the agreement between John Rak and SHM.

R. 56(a)1 Stmt at ¶ 9; Pl.'s R. 56(a)2 Stmt at ¶ 9.  Moreover, after he signed the

contract, the Rak vessel was indeed stored there, and the parties were performing

under the contract as to that vessel.  Thus, interpreting that "[w]ords and other conduct

. . . in light of all the circumstances", it is clear that "the principal purpose of the parties"

in entering into the contract was for the storage of the Rak vessel, even if there was not

an explicit reference to that vessel (or its owner) in the written contract.

Accordingly, the court concludes that the summer slip contract is not voidable

due to essential terms being missing.

D.      Application of the Release Clause

The court next considers the clause in the summer slip contract releasing SHM

for liability "caused solely or in part by the negligence of [the] marina."  Defs.' Ex. A to

Aff. of Matthew Marshall.  "Whether th[is] exculpatory clause in [the summer slip

contract] fully absolves [SHM] from all liability for its own negligence, and if so, whether

it is enforceable, implicates this Court's admiralty jurisdiction."  Dominici v. Between the

Bridges Marina, 375 F. Supp. 2d 62, 64-65 (D. Conn. 2005).  Thus, the court's analysis

must proceed in two steps.  First, the court must determine whether "the intent to fully

exonerate [SHM] from its own negligence" was "clearly and unequivocally expressed."

Id. at 65.  If the court concludes it was, then it must then turn to the issue of whether the

exculpatory clause is enforceable as a matter of public policy.  Id. at 66.

1.      Clear and Unequivocal Intent

First, the exculpatory clause in the contract clearly and unequivocally releases

SHM from all negligence liability.  That provision provides that the Marina "shall not be

liable to Owner or to any party claiming by, through or under Owner for . . . damage to

or destruction, loss, or loss of use . . . of any property of Owner . . . located in or about

17

the Marina . . . **EVEN IF SUCH LIABILITIES ARE CAUSED SOLELY OR IN PART BY THE NEGLIGENCE OF [THE MARINA], BUT NOT TO THE EXTENT SUCH LIABILITIES ARE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF [THE MARINA]**.”  Defs.’ Ex. A to Aff. of Matthew Marshall.  Certain Underwriters disputes that this provision is clear by raising similar ambiguity arguments to what the court has already addressed above – e.g., that the meaning of the term “Owner” is uncertain because it was John Rak who actually signed the contract, but he did not own the vessel being stored.  Pl.’s Mem. at 13.  For the same reasons articulated above, see supra Section V.C, the court again rejects these arguments.

 This, however, is not Certain Underwriters’ main argument as to why the release clause should not apply.  Instead, they focus primarily on step two of the courts analysis – whether the provision is enforceable.  It is to that questions that the court next turns.

  2. Enforceability

 The court must “examine whether public policy supports restricting such absolution of all liability for the marina’s own negligence.”  Dominici, 375 F. Supp. 2d at 66.  Although “[e]xculpatory clauses are not per se unlawful”, courts applying admiralty law in this Circuit have understandably been hesitant to enforce such broad waivers of liability.  Id.  However, “[i]n weighing competing public policy considerations, there is general agreement among the circuits that the following three factors are relevant in determining whether to enforce an exculpatory clause in a marine contract: (a) the nature of services covered by the contract; (b) whether the exculpatory clause is being applied to intentional, reckless, or grossly negligent behavior or rather to ordinary negligence; and (c) whether the exculpatory provisions were obtained through overreaching.”  Id.; see also Falcone v. MarineMax, Inc., 659 F. Supp. 2d 394, 400

(E.D.N.Y. 2009) (employing the same three-part test for enforceability but declining to examine the issue at that stage of the litigation because "[t]he public policy concerns with exculpatory clauses are . . . best channeled into a fact-specific examination" and "additional factual development of these issues [was still] required") (internal quotations and citations omitted).[8]

Here, all three factors militate towards enforcing the provision.  First, federal courts across the country sitting in admiralty have generally recognized that "[t]he nature of the services covered by the contract alters the public policy prism through which exculpatory clauses are viewed."  Dominici, 35 F. Supp. 2d at 66.  While the Supreme Court has held that provisions releasing a towing company from all negligence liability in a maritime towage contract are invalid as a matter of public policy, see Bisso v. Inland Waterways Corp., 349 U.S. 85 (1955), "the circuits [have] generally agree[d] that Bisso is limited to towage contracts" or similar circumstances.  Dominici, 35 F. Supp. 2d at 67.  In other contexts, however, where the bargaining power between the parties is less inherently unequal, the vessel owner has more capacity to choose with whom to contract, and there are other alternative deterrents to negligence, courts have been more willing to enforce the clause and "'uphold the strong public policies of recognizing parties' liberty to contract.'"  Id. (quoting Sander v. Alexander Richardson Investments, 334 F.3d 712, 719 (8th Cir. 2003).

---

[8] In its Memorandum, Certain Underwriters urges the court to apply Connecticut state law rather than federal maritime law on the issue of enforceability of the exculpatory clause as a matter of public policy.  See Pl.'s Mem. at 16-18.  Though plaintiff is not incorrect that application of the factors set forth by the Connecticut Supreme Court in Hanks v. Powder Ridge Restaurant Corp., 276 Conn. 314 (2005) could lead to a different conclusion here, it is maritime law that controls this case, not state law.

Such is the case with storage contracts.  For instance, in <u>Sander</u>, the Eighth Circuit held that the <u>Bisso</u> "doctrine prohibiting a party from completely absolving itself from liability for its own negligence is limited to circumstances involving relationships similar to towage agreements, such as bailment, employment, or public service relationships."  <u>Sander</u>, 334 F. 3d at 719.  The court found that public policy counseled towards enforcing such an exculpatory clause when, similar to the case here, "the [contractual] relationship at issue . . . involve[s] a marina and a boat owner contracting to rent a slip at the marina to dock a boat."  <u>Id.</u>  In doing so, the court cited approvingly a case from a district court in this Circuit holding the same.  <u>Id.</u> (citing <u>Commercial Union Ins. Co. v. Blue Water Yacht Club Ass'n</u>, 239 F. Supp. 2d 316, 321 (E.D.N.Y. 2003).  District courts in this Circuit have since continued to rely on <u>Sander</u> and <u>Commercial Union</u> to hold that the "nature of services" provided for in vessel storage contracts does not rise to the level of <u>per se</u> invalidating an exculpatory clause.  <u>See, e.g.</u> <u>Dominici</u>, 375 F. Supp. 2d at 69 (concluding that, on the first factor, boat owners seeking winter storage are likely to "rationally choose to bear the risk of accident or the marina's negligence, and carry the appropriate insurance"); <u>Falcone</u>, 659 F. Supp. 2d at 400 (citing <u>Sander</u> and <u>Dominici</u> approvingly but declining to analyze the enforceability factors absent sufficient facts in the record to do so).  The court here follows that lead, and proceeds to the second <u>Dominici</u> factor: whether the exculpatory clause is being applied to intentional, reckless, or grossly negligent behavior or rather to ordinary negligence.

This second factor requires minimal analysis, as the terms of the exculpatory clause fit quite comfortably into the framework described as appropriate by the <u>Dominici</u>

court.  Indeed, the clause explicitly applies the release of liability to damages "caused solely or in part by [ ] negligence."  Defs.' Ex. A to Aff. of Matthew Marshall (emphasis added).  Moreover, the clause also provides that it does not apply to "liabilities [that] are caused by the gross negligence or willful misconduct" of the marina.  Id.  Thus, the clause is appropriately tailored and does not extend beyond ordinary negligence.

Third, the court also concludes that the exculpatory provision was not obtained by overreaching.  Overreaching "is defined as the act or an instance of taking unfair commercial advantage of another."  Dominici, 375 F. Supp. 2d at 68 (internal quotations and citations omitted).  If the parties "have equal bargaining power, overreaching is unlikely to be found."  Id.  However, it is equally true that "unequal bargaining power" or an adhesion contract between "the parties cannot, in itself, support a finding of overreaching.  The test rather is whether the disparity in bargaining power was used to take unfair advantage of a party to the contract."  Id.  Here, there is no evidence in the record upon which a reasonable jury could conclude that SHM exerted its superior bargaining power over John Rak in an unfair way.  Indeed, the bargaining process was entirely straightforward.  SHM sent the contract to John Rak.  Defs.' R. 56(a)1 Stmt at ¶¶ 6-7; Pl.'s R. 56(a)2 Stmt at ¶¶ 6-7.  Rak then read and signed the contract so that the Rak vessel could be stored at SHM.  Defs.' R. 56(a)1 Stmt at ¶¶ 9, 12, 18; Pl.'s R. 56(a)2 Stmt at ¶¶ 9, 12, 18; Dep. of John Rak at 15-16.  The record is devoid of any evidence that SHM overreached in securing Rak's agreement to the contract "by, for example, engaging in fraud or coercion or by insisting on an unconscionable clause."  Sander, 334 F.3d at 720.

### 3.    Conclusion

Thus, because the clause releasing SHM from liability for its own negligence was clear and unequivocal, and the clause is enforceable as a matter of public policy, the court concludes that it applies here and defendant SHM's Motion for Summary Judgment is granted on that ground.[9]

E.    Issues of Material Fact as to SHM's Negligence

Finally, the court also notes that, even if it were to conclude that neither the release nor the waiver of subrogation clause bar Certain Underwriters' suit, summary judgment would still be warranted because it has failed to introduce any evidence into the record upon which a reasonable juror could conclude that SHM was negligent.

"Under federal maritime law, a negligence claim consists of four elements."  In re M/V MSC FLAMINIA, No. 12-CV-8892, 2017 WL 3738726, at *5 (S.D.N.Y. Aug. 30, 2017).  These elements "are essentially the same as land-based negligence under the common law."  Manhattan by Sail, Inc. v. Tagle, 873 F.3d 177, 183 (2d Cir. 2017) (internal quotations and citations omitted).  "To prevail on [its] claim of negligence [here], [Certain Underwriters is] required to prove, by a preponderance of the evidence" each of these four elements: "(1) the existence of a duty of care owed by the defendant; (2) breach of that duty; (3) a causal connection between the conduct resulting in the breach and [damage]; and (4) actual loss, injury, or damage."  Id.; In re M/V MSC FLAMINIA, 2017 WL 3738726, at *5.

---

[9] Because the court concludes that the release clause bars Certain Underwriters' action, it need not address SHM's alternative argument that the waiver of subrogation does as well.

Here, there is no evidence in the record upon which a reasonable juror could conclude that SHM breached its duty to John and Stephen Rak.  It is well established that "[a] defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial."  Parker v. Sony Pictures Entertainment, Inc., 260 F. 3d 100, 111 (2d Cir. 2001).  In its Motion and supporting evidence, SHM argued just that: essentially, that "[t]here is no evidence that [SHM] launched the Rak [v]essel without the drain plug installed" or was negligent in any other way that caused the damage to the vessel.  Def.'s Mem. at 14.  In response, however, Certain Underwriters has not pointed to any evidence of SHM's negligence; instead, it has simply attempted to undermine the "bases [for SHM's] claim" and argued that SHM "has not produced any credible evidence to show that [it] actually performed all of its duties."  Pl.'s Mem. at 18, 20 (emphasis in original).

This approach, however, impermissibly flips the burden to SHM to prove the absence of negligence.  To the contrary, it is Certain Underwriters' burden at this stage to introduce evidence upon which a reasonable juror could conclude that SHM was negligent.  It has not done so.  See Pl.'s Additional Material Facts (Doc. No. 47-1) (including no evidence that SHM breached its duty in any way); Pl.'s Mem. at 18-21 (same).  Nor has it argued any doctrine of tort law that could permit a jury to infer that SHM was negligent, such as res ipsa loquitur.[10]  See generally Pl.'s Mem.  Accordingly,

---

[10] Even had Certain Underwriters argued res ipsa loquitur, the court notes there may have been issues with that theory of liability given the facts of this case.  "Under that doctrine, a fact-finder may infer negligence merely from the happening of the event that caused the harm if: (1) the event is of a type

plaintiff has failed to meet its burden of introducing evidence upon which a reasonable

jury could conclude SHM was negligent, and summary judgment would also be

warranted on that ground.

## VI.    CONCLUSION

For the reasons discussed above, the court grants the Motion for Summary

Judgment (Doc. No. 44) as to defendant SHM.  The claim against Safe Harbor is

dismissed, and the claim against Brewer is terminated as moot.  The Clerk is instructed

to close this case.

**SO ORDERED.**

Dated at New Haven, Connecticut this 20th day of May 2022.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

ordinarily would not occur in the absence of negligence; (2) it is caused by an agency or instrumentality under the exclusive control of the party charged with negligence; and (3) it is not due to any voluntary action or contribution on the part of the injured party."  Tagle, 873 F.3d at 180 (emphasis added).  Here, it is uncertain whether plaintiff could satisfy the second element of res ipsa, as John Rak testified that an employee of Offshore was on board the vessel giving it a jump start for approximately 15 minutes.  Dep. of John Rak at 36.  Regardless, the parties have not raised this issue, and the court need not address it comprehensively.